Filed 3/2/15  P. v. Orozco CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH SAINT OROZCO,<br><br>        Defendant and Appellant. | A138971<br><br>(Humboldt County<br>Super. Ct. Nos. 1200518 & 1201243) |

### INTRODUCTION

Defendant Joseph Orozco appeals his convictions for one count of continuous sexual abuse of a child in violation of Penal Code section 288.5, subdivision (a) and two counts of lewd acts on a child in violation of Penal Code section 288, subdivision (a). Defendant contends the court misstated the law in instructing the jury in violation of his constitutional rights.  He also asserts his counsel was ineffective for failing to object to alleged prosecutorial misconduct during closing argument.  We find no reversible error and affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On April 3, 2012, the state filed a first amended information (Super. Ct. Humboldt County, 2012, No. CR1200518) charging defendant with one count of continuous sexual abuse of a child in violation of Penal Code section 288.5, subdivision (a), based on his conduct with Jane Doe 2 (count 2) and one count of lewd acts on a child in violation of Penal Code section 288, subdivision (a) for his conduct with Jane Doe 1 (count 1).  A

second information filed on April 10, 2012 (Super. Ct. Humboldt County, 2012, No. CR1201243) charged defendant with another count of lewd acts on a child in violation of Penal Code section 288, subdivision (a) for his conduct with Jane Doe 3 (count 3).

Beginning on February 20, 2013, defendant was tried on all three counts before a jury. The jury deliberated for approximately 12 hours over the course of three and half days and returned a verdict of guilty on all counts on April 8, 2013.

Defendant was sentenced to a term of six years on the continuous sexual abuse count and to consecutive terms of two years each on the two lewd act counts, for a total sentence of 10 years.

## I.     The Prosecution's Case

Defendant worked at Hoopa Valley Elementary School (Hoopa Elementary) as an instructor in the after-school program. He was charged with several instances of child abuse for his contact with Jane Doe 1, Jane Doe 2, and Jane Doe 3.

### A.     Jane Doe 1

Jane Doe 1, who was 10 years old at the time of trial, testified she knew defendant from the after-school program at Hoopa Elementary. She related she would sit on defendant's lap when she wanted to use the computer. Defendant would touch her legs and he licked her feet. He touched her below the waist in "the privacy." She testified that he rubbed her private areas more than once. She said she would ask him to stop or "pull him off." He would also touch and slap her bottom. She testified she told the police interviewer defendant had touched her friends in "the wrong way." She saw him touch Jane Doe 3 and another girl. She testified she called defendant a pervert and told Jane Doe 2 he was a pervert. Jane Doe 1's mother testified that her daughter told her defendant "touched me in my private parts, Mommy."

2

The district attorney investigator testified he found a picture collage containing a picture of Jane Doe 1 in defendant's room. Jane Doe 1 stated she never gave defendant a picture of herself.

**B.    Jane Doe 2**

Jane Doe 2 was 11 years old when she testified at trial. She described a time when defendant took her to the teachers' lounge. It was just the two of them, and defendant asked her to give him a hug. She then described: "He stuck his fingers straight down my shirt" to her chest. She pulled his hands out and "blocked" off her chest. Defendant then told her: "Don't be shy." She said that she walked out of the room and felt scared. She called her mother and went home.

Jane Doe 2's mother testified that on the day of the incident, she received a call from her daughter asking to come home from the after-school program. Her daughter told her that she never wanted to go back to the program. She told her mother about the incident and her mother reported the incident to the school.

Nena Hames, defendant's supervisor at the after-school program, testified that defendant would have Jane Doe 2, whom they called "Tiny," come sit on his lap during homework time and he gave her massages.

**C.    Jane Doe 3**

Jane Doe 3, who was 10 years old at the time of trial, testified she sat on defendant's lap and played games on his computer. She stated the defendant touched her more than once on her butt, crotch, and thighs. She recounted defendant would move his hands on her crotch area. She acknowledged she told Jane Doe 1 defendant touched her inappropriately and Jane Doe 1 told her to "keep your mouth shut."

Nena Hames related defendant would have Jane Doe 3 sit on his lap and he gave her massages.

3

### D. Other Prosecution Witnesses

Trisha St. Denis testified about working with defendant at the Hoopa Elementary after-school program. She observed behavior by defendant that caused her concern, including having female children sit on his lap and tickling them. She felt defendant gave Jane Doe 1 special treatment, including staying in the room with defendant while the other children went to the playground. She said defendant would hug female students; it was sometimes initiated by him and other times by the students. She described a partition that could be put up between defendant's desk and the rest of the room, and stated there were times when he was behind the three-foot-high partition with Jane Doe 1.

Nena Hames, a site leader for the after-school program at Hoopa Elementary, testified she had concerns about defendant's conduct. She observed defendant touch, massage, and "constantly engage in physical contact" with the children. She said he engaged in this type of conduct with female students in the age range of seven to nine years old. He gave special attention to Jane Doe 1, including letting her sit on his lap and massaging her shoulders. She reported defendant's conduct to her supervisor. She kept a log of defendant's actions with Jane Does 1, 2, and 3 and submitted it to her supervisor with a written complaint. She did not, however, report her complaints to law enforcement or any of the girls' parents. She described an incident with another child, E., in which defendant was sitting next to her rubbing her hip in a suggestive, sexual way. Hames approached defendant and told him to stop touching the girl.

S.B. testified that defendant was a teacher's aide in her fifth grade class when she attended Hoopa Elementary School. She stated one day when she was the last one leaving the classroom, defendant "cupped my butt on the way out of the classroom."

Lola Henry worked at the Hoopa Tribal Head Start Program where defendant was a parent volunteer for C.L., the daughter of his friend and housemate. Henry observed defendant taking three- and four-year-old girls to the bathroom and going into the restroom with them. She also testified it made staff uncomfortable that he would have

4

children sit on his lap. Some parents complained and Henry told defendant he could not have children sit on his lap.

Martin Morris, an investigator with the Humboldt County District Attorney's Office, testified that during the search of defendant's room, investigators found numerous pornographic DVD's. The DVD's were not illegal because they contained images of women who were over the age of 18, but the titles suggested the performers were younger: "Baby Face," "My First Adult Scene," and "Forty of Adult's Youngest Stars."

District attorney investigator and computer forensic examiner Richard Grimm testified about defendant's computers. He examined four hard drives and reviewed all the data. Using forensic software, he was able to recover a deleted folder titled "lolicon" on one of the hard drives that contained images of child pornography. He also found folders labeled "on bed," "on knees," "sitting up," "ropes" and "sleep babysitter," among others. He found a file containing 66 images labeled "tiny full naked." He testified that the folder names could not be default names created by the computer and would have to be created by the user. A user would also have to create the subfolders within the folders. He explained there were other folders that were created separately containing images of child pornography. In other words, not all the images were in one folder or subfolder created at the same time.

On cross-examination, Grimm explained all of the child pornography files had been deleted or overwritten on or before February 2010. He testified not all the pictures were downloaded at the same time because they had different creation dates.

## II.  Defense Case

Defendant's first witness was C.L. In 2001, defendant began living with E.L. and her daughter C.L. when C.L. was four months old. Defendant acted as a father to C.L. over the next 10 years. At trial, C.L. testified the defendant was her "dad." She testified she would sit on defendant's lap and she saw other girls sit on his lap, including Jane Does 1 and 2. She stated he never touched her in an inappropriate way or made her feel

5

uncomfortable. The prosecution questioned her about allegations of molestation she made about defendant in 2005 but she stated that she did not recall making the statements.

Defendant described his position at the Hoopa Elementary after-school program. He testified that there was only one instance when anyone talked to him about his interaction with students. His supervisor, Nena Hames, admonished him because she was uncomfortable about how he let a particular student "climb on" him.

Defendant acknowledged it may have appeared he gave Jane Doe 2 special treatment because she finished her homework quickly and he allowed her to use his computer. He stated he would allow Jane Doe 2 to sit on his lap. He affirmed he massaged students' necks and shoulders, but denied rubbing any students on their thighs.

Regarding the incident with Jane Doe 2 at the staff lounge, he testified that he never hugged Jane Doe 2. He stated they went to the vending machines by the gym and he gave her money to buy snacks as a belated birthday gift. He said he gave her $2 and, when she asked for more money, he said something like, "Don't be shy about it." He said to her, "[Y]ou're getting all these snacks, . . .what do I get?" and she said, "[A] hug." He hugged her around the shoulders but he did not touch any other part of her body. He never attempted to put his hand down her shirt or touch her chest.

He conceded he had hugged Jane Doe 1, but stated usually she initiated the hugs and that she sat on his lap. He said Jane Doe 1 called him a pervert in class on two occasions. He admitted he had a school picture of Jane Doe 1 on the wall in his room, but related Jane Doe 1 gave it to him.

While defendant was employed at the elementary school, he received three letters about his conduct. He received a letter in December 2012 from the school district outlining three complaints against him that included allowing a child to sit on his lap and acting inappropriately with female students. He received another letter addressing a

6

complaint that he gave money to a student, Jane Doe 2. He also testified about a complaint that he touched a child on the bottom during a recess game.

Regarding his computer equipment, defendant testified that he had nine operational hard drives. He maintained he never purposefully downloaded child pornography onto his hard drives. He conceded he contacted a fan site for tennis player Maria Sharapova for some video of a tennis championship via a file sharing service but, when he downloaded the video, he also inadvertently copied certain child pornography. When he discovered the images of child pornography, he tried deleting the photos. He stated they would not, however, "stay erased." He believed his computer had a virus and continued to try to erase the child pornography. He then "wiped" the hard drive but the child pornography reappeared.

On cross-examination, defendant denied creating any of the folders on his computer that contained child pornography. He challenged the claim one of the images named "Tiny" had any connection to Jane Doe 2. On cross-examination, defendant attempted to explain why the images of child pornography were detailed on more than one hard drive. Defendant stated he "wiped" the hard drive to remove the images. After deleting the content of the hard drive, he then had to reinstall the operating system. The prosecutor asked: "So you wiped this hard drive, then you reinstall the software, and these digital images reappear on your computer, Mr. Orozco?" Defendant responded: "Yes." Defendant explained that he researched viruses and came across a process called remote access transmission (RAT). The prosecutor asked: "So your research indicated that these digital images may have reappeared on this wiped hard drive because of this RAT acronym?" Defendant responded: "That came closest to any explanation . . . I could find." Defendant, however, admitted the data showed that the images were viewed multiple times.

The prosecutor asked defendant about his research regarding RAT. Defendant responded: "[W]hat I understand . . . is that . . . a remote computer user, which we'll call

7

the hacker, can gain access to another user's computer." The prosecutor then asked defendant if he understood that RAT requires software on the computer to allow for remote access and defendant said yes. The prosecutor then asked: "And why is it that this RAT, Remote Access Transmission software[,] was not found on that hard drive, Mr. Orozco, if the reason why these pictures mysteriously appeared on your hard drive was because you must have had this RAT?" Defendant responded: "I—I can't explain that." On recross-examination, the prosecutor again asked why no software that would enable transmission was found on the hard drive and defendant responded he did not know what was on the hard drive.

On redirect examination, defense counsel asked what part of a computer is attacked by RAT. Defendant explained that RAT required "some sort of software to have been installed," and he may have inadvertently installed the software while downloading what he believed to be video segments.

Defense expert Marjorie Walters, Ph.D., testified about the National Institutes of Child Health and Human Development (NICHD) protocol for forensic interviews of children. Walters reviewed the Humboldt County Child Abuse Services Team (CAST) interviews with Jane Doe 1, Jane Doe 2 and Jane Doe 3 as well as two other children. During her testimony, the three interviews were played for the jury. Walters testified the CAST interviewer did not strictly follow the NICHD protocol. For instance, she faulted the interviewer for asking the child to promise to tell to the truth rather than saying that it is important to tell to the truth. She believed the interviewer asked too many closed questions, used leading or suggestive questions, and repeated questions.

On cross-examination, Walters testified that she knew nothing about the training or certification required for the CAST team in Humboldt County. She did not review the actual forensic protocol that was used by the Humboldt CAST team. She acknowledged she was unaware the Humboldt CAST team was federally and state certified for child

8

interviews. She did not know whether the CAST interviewer's protocol was in compliance with the National Children's Advocacy Center training and protocol.

## DISCUSSION

**I.      Jury Instructions**

Defendant contends that the trial court erred in instructing the jury on the order in which they could deliberate on the greater versus the lesser charges; the court provided the correct instruction both orally and in writing pursuant to CALCRIM No. 3517, but then added some additional verbal instructions that may have confused the jury.

The court instructed the jury that defendant was charged with lewd and lascivious acts with a child under the age of 14 in counts 1 and 3, and continuous sexual abuse in count 2 and the lesser included offenses of sexual battery, annoying or molesting a child, and simple battery applied to all three counts. The court instructed the jury correctly both orally and in writing:

"If all of you find the defendant is not guilty of a greater crime, . . . you may find him guilty of a lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct

"Now I will explain to you which crimes are affected by this instruction:

"Sexual battery is a lesser crime of lewd and lascivious acts with a child under 14 and continuous sexual abuse charged in Counts One, Two, and Three.

"Simple battery is a lesser crime of lewd and lascivious acts with a child under 14, continuous sexual abuse, charged in Counts One, Two, and Three, and sexual battery as a lesser included offense

"Annoying or molesting a child is a lesser  crime of lewd and lascivious acts with a child under 14 and continuous sexual abuse as charged in Counts One, Two and Three.

9

"It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime.

"For any count in which a greater or lesser crime is charged, you will receive verdict forms for guilty and not guilty for the greater crime and also verdict forms for guilty and not guilty for the lesser crime. *Follow these instructions before you give me any completed and signed final verdict form.* Return any unused verdict form to me, unsigned.

"1. *If all of you agree the People have proved that the defendant is guilty of a greater crime, complete and sign the verdict form for that crime. . . . Do not complete or sign any other verdict form for that count.*

"2. *If all of you cannot agree whether the People have proved the defendant is guilty of the greater crime, inform me only that you cannot reach an agreement and do not complete or sign any verdict form for that count.*

"3. *If all of you agree the People have not proved the defendant is guilty of the greater crime and you also agree the People have proved that he is guilty . . . of the lesser crime, complete and . . . sign the verdict form for not guilty for the greater crime and the verdict form for guilty for the lesser crime.*

"4. *If all of you agree the People have not proved the defendant is guilty of the greater or lesser crime, complete and sign the verdict form for not guilty of the greater crime and a verdict form for not guilty of the lesser crime.*

"5. *If all of you agree the People have not proved the defendant is guilty of the greater crime, but all of you cannot agree on a verdict for the lesser crime, complete and sign the verdict form for not guilty for the greater crime and inform me only that you cannot reach an agreement about the lesser crime.*

"Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt, unless I specifically tell you otherwise.

10

"Follow these instructions when you decide whether the defendant is guilty or not guilty of sexual battery, which is a lesser crime than lewd and lascivious acts with a child under 14 and continuous sexual abuse.

"Follow these directions when you decide whether the defendant is guilty or not guilty of simple battery, which is a lesser crime than lewd and lascivious acts with a child under 14, continuous sexual abuse, and sexual battery.

"Follow these instructions when you decide whether the defendant is guilty or not guilty of annoying or molesting a child, which is a lesser crime than lewd and lascivious acts with a child under 14 and continuous sexual abuse." (Italics added).

As stated to the jury, the instruction complied with CALCRIM No. 3517 and is a legally correct articulation of the jury's review process when filling out verdict forms. (*People v. Fields* (1996) 13 Cal.4th 289, 309-311 [California follows the "acquittal first" principle]). It indicated what the lesser offenses were and stated the jury could return verdicts on the lesser included offenses so long as they unanimously found the defendant not guilty of the greater offense, a proper statement of the "acquittal first" rule.

During closing arguments, the court provided an additional instruction to the jury that was overlooked in the original instructions, especially concerning CALCRIM No. 3517, the process of filling out verdict forms. The court added the following language: "Lewd and lascivious acts with a child under 14 is a lesser-included offense of that charged in Count Two, continuous sexual abuse." During a break in closing arguments, the court further instructed the jury: "[W]hen I corrected 3517, I noticed another problem; not a big problem but a problem, nonetheless. [¶] Essentially, lesser included instructions, you'll see from 3517, you start with the greater offense. You make a finding of guilty, not guilty, or you can't make a decision; in other words, you're deadlocked as to that. The only time you move on to a lesser offense is if you find a person not guilty of the greater offense." The court then explained for counts 1 and 3, the jury should start with Penal Code, section 288, subdivision (a) and if it found defendant

11

not guilty then "you can move to lesser offenses" of annoying or molesting a child or sexual battery and then simple battery. The court explained that for count 2, the jury should start with continuous sexual abuse, then "you move down to lewd and lascivious acts with a person under the age of 14 years."

In discussing the verdict forms, the court instructed the jury: "As to Counts One and Three—and the reason why I'm going through this is in order to return a lesser verdict that you have to deal with the greater crime first." The court stated that if the jury wanted to return a verdict on the lesser included offenses, it needed to reach a not guilty finding on the lewd and lascivious acts first. "As to annoying or molesting a child, or sexual battery, as I say, you have to make that first determination that the defendant's not guilty of the greater crime." The court explained: "In order to get to simple battery, you have to go through first the greater crime, the lewd and lascivious acts, then you have to go through sexual battery, and then you move down to battery. So not guilty finding as to the greater crime, the sexual battery, and then you can get down to the battery and make whatever determination you're gonna make in that respect."

The court then instructed the jury that for count 2, there is an additional step because there are two lesser included offenses: if the jury finds defendant not guilty of continuous sexual abuse, they can "move on to the lesser-included offenses."

We have reviewed the arguments by counsel, especially defendant's attorney, in this matter. The thrust of the attorney's argument focused on the credibility of the three girls—how their individual versions were not reliable and how the government investigators by their interrogation techniques manipulated the children into their account of the alleged criminal conduct. It is this court's assessment the defense argument was focused on defendant's innocence, not his liability on lesser offenses. Indeed, there was no reference to the lesser crimes as alternatives for the jury's consideration. Of course, the prosecution contended defendant was guilty of the greater crime in each count.

12

It is significant the jury never asked about lesser included offenses during their deliberations. We cannot speculate they felt the need to consider the lesser offenses from a silent record. Instead, their questions focused on requests for the testimony of the three girls and the recorded CAST interviews, along with two other prosecution witnesses.

The instructional error at issue here requires reversal only where it is "reasonably probable that a different result would have occurred had the contested instructions not been given." (*People v. Kurtzman* (1988) 46 Cal.3d 322, 335 [applying the prejudice standard from *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]; *People v. Berryman* (1993) 6 Cal.4th 1048, 1078 [applying *Watson* standard to instructional error].)

In the key case on this issue, *People v. Kurtzman,* the Supreme Court held: "We conclude that our decision in *Stone v. Superior Court* (1982) 31 Cal.3d 503, properly interpreted, simply restricts a jury from *returning a verdict* on a lesser-included offense before acquitting on a greater offense and does not preclude a jury from *considering* lesser offenses during its deliberations." (*People v. Kurtzman, supra,* 46 Cal.3d at pp. 324-325 (*Kurtzman*).) In *Kurtzman*, during the third day of deliberations, the jury informed the court that it could not reach agreement on murder but could agree on manslaughter. (*Id.* at p. 327.) The court instructed the jury: " 'Before you get to the other lesser included offenses, I want to find out if you have unanimously agreed on the original charge, which is murder in the first degree. . . . [T]ell me what the status is on that one charge before we go to the lesser ones.' " (*Id.* at p. 327-28.) After further deliberation, the jury asked whether they could find the defendant guilty of manslaughter without unanimously finding him not guilty of murder. The court sent a written response: " 'No, you must unanimously agree on the second degree murder offense before *considering* voluntary manslaughter.' " (*Id.* at p. 328.)

The Supreme Court held that "the jury may not *return a verdict* on the lesser offense unless it has agreed beyond a reasonable doubt that defendant is not guilty of the greater crime charged, but it should not be interpreted to prohibit a jury from *considering*

13

or *discussing* the lesser offenses before returning a verdict on the greater offense." (*Kurtzman*, *supra*, 46 Cal.3d at p. 329.) The trial court had erred by instructing the jury that it could not " 'deliberate on' " or " 'consider' " the lesser offense but the error did not require reversal. (*Id.* at p. 335.) The jury had been deliberating on both charges and despite the incorrect instruction from the court, they "obviously continued to consider both voluntary manslaughter and second degree murder[;] it is not reasonably probable that a different result would have occurred had the contested instructions not been given." (*Id.* at p. 335.) Again, we do not have such evidence presented here because the jury never indicated they were deadlocked or that they were even considering any lesser charge. A silent record does not support defendant's conclusion the trial judge's offhand remarks discussed above prevented the jury from "considering" the lesser included offenses here, especially when the original instruction to the jury in no way prevented such juror review.

Similarly, in *People v. Perez* (1989) 212 Cal.App.3d 395, the defendant was charged with second degree murder, which included a series of lesser included offenses. The trial court correctly instructed the jury prior to deliberations. However, during deliberations, in response to a jury note they were deadlocked, the court instructed: "I think you're on the right track, in that you must resolve count I, the second degree charge, before you can consider the other charges. And that's only if you consider a not guilty as to count I. If you consider—if you can't resolve that, of course, that precludes you from handling any of the lesser offenses." (*Id.* at p. 399.) The court's instruction that the jury could not "consider" the lesser offenses before acquitting on the greater charge of murder was error, but the error was harmless because the court correctly instructed the jury initially, the subsequent instruction was ambiguous, and there was substantial evidence of the greater offense of second degree murder. (*Id.* at p. 400.)

In *People v. Bacon*, the defendant was charged with murder in count 1 and accessory to murder in count 4. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1108-1109.)

14

The court instructed the jury pursuant to CALJIC No. 8.75 (like CALCRIM No. 3517) and then gave a special instruction advising the jury the defendant could not be convicted of both murder and the crime of accessory to murder. "In order to find the defendant guilty of the crime charged in Count 4, accessory after the fact to murder, you must first unanimously find the defendant not guilty of the crime charged in Count 1, murder of the first degree, and not guilty of the lesser offense of murder of the second degree." (*Bacon*, at p. 1109.) The defendant argued the instructions were ambiguous and may have " 'misled the jurors to believe that they were not free to order their substantive deliberations the way they saw useful or proper.' " (*Id.* at p. 1110.) The Supreme Court found no error because it was not reasonably likely the jury would have failed to understand they had discretion to choose the order they evaluated the charges. (*Ibid.*)

Here, the jury was correctly instructed pursuant to CALCRIM No. 3517 prior to closing arguments. During closing arguments, the court further instructed the jury and stated they needed to find defendant not guilty of the greater offense before "moving on" or "moving down" to the lesser offense. Unlike *Kurtzman*, *supra*, 46 Cal.3d 322, the court never told them they had to unanimously agree on acquittal of the greater offense before moving to the lesser. Like *Perez*, *supra*, 212 Cal.App.3d 395 and *Bacon*, *supra*, 50 Cal.4th 1082, the court's instructions here were possibly ambiguous. The court provided the correct standard initially, but the subsequent instructions may have confused the jury about when it could deliberate about the lesser offenses.

Defendant points out that courts have held it is error for a jury to be instructed that it may not consider the lesser included offense until it has unanimously acquitted the defendant of the greater offense. (*United States v. Jackson* (9th Cir. 1984) 726 F.2d 1466, 1470 (*Jackson*) [reversing where the "instruction given by the court did not allow the jury to consider the lesser offense unless the jury first unanimously acquitted defendant of the greater offense. . . . [I]n this case the risk was substantial that jurors harboring a doubt as to defendant's guilt of the greater offense but at the same time

15

convinced that defendant had committed some offense might wrongly yield to the majority and vote to convict of the greater offense rather than not convict defendant of any offense at all"]; but see *United States v. Tsanas* (2d Cir. 1978) 572 F.2d 340, 344-345 [requiring a unanimous verdict of not guilty of the greater offense before allowing the jury to consider the lesser offense is not plain error unless a defendant requests an instruction that the jury may consider the lesser offense when it cannot reach agreement on the greater offense].)

In *Jackson, supra,* 726 F.2d 1466, the panel dealt with the trial court's original instruction the jury could *only* consider the lesser offense if they unanimously acquitted defendant of the charged offense. This limitation was specifically objected to by defense counsel, who had proposed an instruction like CALJIC No. 8.75 given in our case. Here there was no objection to the trial court's remarks during argument but after the jury had been properly read the accurate CALJIC instructions, including CALJIC No. 8.75.

Defendant still asserts this case is similar to the error in *Jackson*, *supra*, 726 F.2d 1466, because the jury considered this a close case and deliberated for three and a half days. While it is true that the jury deliberated over a three and a half day period, they were only in session until noon each day; their actual deliberation time totaled approximately 12 hours after a trial that lasted 16 days (although many of those were half days). There was no indication that this was a close case or that the jury was ever deadlocked about the greater offenses. The jury only sent notes requesting readback. During the second day of deliberations, the jury requested readback of the testimony of Kim Peters, the three victims, and the recorded CAST interviews. On the final day of deliberations, the jury requested the testimony of Trisha St. Dennis. Importantly, the jury did not ask for clarification of the jury instructions or make any inquiry regarding the lesser included offenses.

The evidence against defendant as to the greater crimes was substantial. Each of the victims testified about defendant's inappropriate touching and their testimony at trial

16

mirrored their statements in the CAST interviews. Jane Doe 1 testified defendant touched her in "the privacy" and touched her friends "in the wrong way." A picture of Jane Doe 1 was found in defendant's room. Trisha St. Denis testified that defendant gave Jane Doe 1 special treatment.

Jane Doe 2, "Tiny," testified about defendant putting his hand down her shirt and her mother testified about her daughter wanting to come home from the program and never wanting to return. Investigator Grimm described a folder of child pornography on defendant's computer that was titled, "[T]iny full naked."

Jane Doe 3 testified about defendant touching her butt, crotch, and thighs and moving his hand on her crotch area.

This testimony was corroborated by Nena Hames, who told the jury the defendant would have Jane Does 2 and 3 sit on his lap and he gave them massages. In addition, another student, S.B., testified about defendant "cup[ping] my butt" several years earlier.

The CAST interviews of the three victims were played for the jury and, while defense expert Walters testified that the interviews did not strictly follow the NICHD protocol, the interviews themselves were persuasive evidence nonetheless. The interviewer followed the same protocol with each of the three victims, and they clearly describe how and where defendant touched them.

The prosecution presented evidence of extensive child pornography on defendant's computer to demonstrate his sexual interest in young girls. Although defendant testified the child pornography was transferred to his computer via RAT, he could not explain why it remained after he "wiped" his hard drive and reinstalled the operating system. The prosecution introduced evidence the images were on more than one hard drive and were contained in folders that had names that must be created by the user (such as "on bed," "on knees," and "ropes").

17

Given the evidence, any error in the court's instructions was harmless because it is not reasonably probable the jury would have reached a different result absent the error. (See *Watson*, *supra*, 46 Cal.2d at pp. 836-837.)

## II. Closing Argument

Defendant claims that the prosecutor committed misconduct by commenting on facts not in evidence during closing argument. He asserts that if his counsel's failure to object waives the misconduct claim, this failure was ineffective assistance of counsel.

In closing argument, the prosecutor discussed the child pornography found on defendant's computer. He stated that defendant presented his theory that the images were transferred to his computer by RAT, "[b]ut there's no software on that hard drive that indicates such a RAT was ever installed, which is what it would require, by Mr. Orozco's own admission, for this RAT to work. Somehow, that software would have to be on that hard drive that Mr. Orozco wiped and then reinstalled completely with the software from the system—from the software manufacturers." He went on to argue the defendant was asking the jury to believe someone repeatedly, over a prolonged period of time, accessed his computer and downloaded images of child pornography. Defense counsel did not object.

In his closing argument, defense counsel addressed the prosecutor's statements about RAT on the hard drive: "And [the prosecutor] said, 'Well, why wasn't that found on the hard drive?' And Mr. Orozco was—I believe stated that this is something you could find in the modem. It doesn't have to be the hard drive. And what he did, Mr. Orozco, is got rid of the computer that actually had that modem after trying to erase the pornography."

### A. Forfeiture

In order to preserve a claim of prosecutorial misconduct on appeal, defense counsel must make a timely objection at trial and request an appropriate admonition from the court. (*People v. Fuiava* (2012) 53 Cal.4th 622, 726-727.) Defendant failed to object

to the challenged statements during closing argument. Thus, defendant argues that counsel's failure to object was ineffective assistance of counsel.

### B. Prosecutor's Statements

Counsel may not state or assume facts in argument that are not in evidence. (*People v. Cash* (2002) 28 Cal.4th 703, 732, citing *People v. Stankewitz* (1990) 51 Cal.3d 72, 102.) "[W]e accord counsel great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence." (*People v. Cash, supra,* at p. 732.) A prosecutor's " 'argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 736, quoting *People v. Harrison* (2005) 35 Cal.4th 208, 244.)

There is " ' "[a] distinction . . . between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." ' " (*People v. Jasso* (2012) 211 Cal.App.4th 1354, 1370, quoting *People v. Thomas* (2012) 54 Cal.4th 908, 939.) A prosecutor may comment on the state of the evidence or the failure of the defense to introduce evidence on a material issue. (*People v. Jasso, supra,* at p. 1370 [finding no error where prosecutor argued that "there [was]no evidence" a shooting was an accident beyond defendant's self-serving statements]; *People v. Wilson* (2005) 36 Cal.4th 309, 338 [holding it was reasonable for the prosecution to point out that defendant did not present any evidence to support his theory of the case].)

In *People v. Valencia*, the prosecutor stated in closing argument that defendant had failed to demonstrate he was under the influence of methamphetamine when he committed the murder. (*People v. Valencia* (2008) 43 Cal.4th 268, 284.) Defendant argued this misstated the evidence because at the time of his arrest, his blood tested positive for methamphetamine. There was, however, no evidence defendant was under

the influence at the time of the killing, supporting the prosecutor's theory of the case. (*Id.* at p. 285.) Whether defendant had supported his theory that he was under the influence of drugs was open to debate. "The prosecutor was entitled to argue defendant had not shown these facts; defense counsel was entitled to argue the opposite. The comments came within the wide range of permissible discussion of the evidence." (*Id.* at p. 285.)

In *People v. Linton*, during closing argument, the prosecutor argued that the defendant masturbated into the victim's underpants after he killed her. (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.) Defendant argued this was misconduct because there was no evidence " 'whatsoever' " to support it. "Although there was no specific evidence indicating when defendant had masturbated on the underpants and defendant could have done so before the murder, it was within the range of reasonable inferences to suggest defendant had done so after the murder . . . ." (*Id.* at p. 1208.) The prosecutor could discuss a reasonable interpretation of the evidence and it was up to the jury to determine whether the prosecutor's interpretation was logical. (*Ibid.*; see also *People v. Stanley* (2006) 39 Cal.4th 913, 953 [defendant's argument that prosecutor argued facts not in evidence was rejected as rebuttal to defendant's argument that defendant's fingerprints were not on the knife and "the prosecutor was merely expounding on the testimony of the fingerprint expert who testified not everyone who handles an object will leave discernable fingerprints on the object."].)

In closing argument, the prosecutor stated that defendant's theory was the child pornography was transferred to his computer by RAT, but there was no software on the hard drive indicating RAT. The prosecutor's argument was based on the fact defendant had presented no evidence of RAT software on his computer and could offer no credible explanation how the pornography got there.

It was defendant who raised the issue of RAT in his testimony. He explained that he researched viruses and came across a process called RAT. The prosecutor asked: "So

your research indicated that these digital images may have reappeared on this wiped hard drive because of this RAT acronym?" Defendant responded: "That came closest to any explanation . . . I could find." The prosecutor asked defendant about his research about RAT. Defendant responded: "[W]hat I understand about RAT is that—that a remote computer user, which we'll call the hacker, can gain access to another user's computer." The prosecutor then asked defendant if he understood that RAT requires software on the computer to allow for remote access and defendant said yes. The prosecutor asked: "And why is it that this RAT, Remote Access Transmission[,] software was not found on that hard drive, Mr. Orozco, if the reason why these pictures mysteriously appeared on your hard drive was because you must have had this RAT?" Defendant responded: "I—I can't explain that." The prosecutor again asked why no software that would enable transmission was found on the hard drive and defendant responded that he did not know what was on the hard drive.

Defendant argues that the prosecutor's statement that there was no RAT software on the computer was not based on the evidence. Defendant contends neither the government's expert nor defendant testified to this fact. The prosecutor was merely relying on his own questions during cross-examination. The prosecutor stated in closing argument there was no RAT software installed on the hard drives. It is true Grimm did not testify directly to this fact, but the district attorney's argument is a reasonable inference from his testimony. It was also an appropriate conclusion to be drawn from defendant's testimony. Defendant testified that he wiped the hard drive and reinstalled the operating system, which would have eliminated all the software, including the RAT. Defendant raised the theory of the RAT in his defense and the prosecutor could properly comment there was no evidence before the jury of RAT software on the hard drives.

We conclude the prosecutor's statement was a reasonable inference from the evidence and did not constitute misconduct.

21

## C.      Ineffective Assistance of Counsel

The prosecutor's arguments were not improper, therefore there was no reason for defense objection.  The failure to object did not violate defendant's right to effective assistance of counsel.  (See *People v. Lopez* (2008) 42 Cal.4th 960, 970.)

To establish ineffective assistance of counsel, a "defendant must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant."  (*People v. Stanley*, *supra*, 39 Cal.4th at p. 954, citing *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.)  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  (*Ibid.*)

Even if the prosecutor's statement was improper, defendant would still not be entitled to relief.  "[E]xcept in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal."  (*People v. Lopez*, *supra*, 42 Cal.4th at p. 972.)  This is especially true when the alleged incompetence arises from counsel's failure to object.  (*Ibid.*)

Here, although counsel did not object, he did address the prosecutor's statement in his closing argument.  In discussing RAT software on the hard drive, counsel said:  "And [the prosecutor] said, 'Well, why wasn't that found on the hard drive?' and Mr. Orozco was—I believe stated that this is something you could find in the modem.  It doesn't have to be the hard drive.  And what he did, Mr. Orozco, is got rid of the computer that actually had the modem after trying to erase the pornography."  Counsel provided an alternative explanation as to why no RAT software was found on the hard drive.

This provides a "conceivable tactical purpose" for counsel's decision not to object. Further, counsel argued that the images were  "peripheral" and a distraction and he elected not to devote much time to discussing them.

22

Even if the prosecutor's statement was improper and counsel should have objected, defendant cannot demonstrate prejudice. Defendant argues that the "child pornography was key to the outcome" of the case. Defendant posits that the images were "central to the case, and [his] only hope of avoiding conviction was persuading the jury to entertain reasonable doubt as to whether he had deliberately downloaded them."

Defendant overstates the importance of this evidence at trial. It is true that the child pornography provided evidence of defendant's sexual interest in young girls, but there was substantial evidence presented to the jury that also supported the charges against him. Defendant contends that the testimony of Nena Hames, Lola Henry and others that his conduct seemed inappropriate was ambiguous and therefore the child pornography was key to his conviction. But the jury saw the CAST videos of Jane Does 1, 2 and 3 and heard their testimony at trial. The girls clearly described defendant touching them in a way that was not ambiguous.

Defendant asserts that the jury could have reasonable doubt about how the images appeared on defendant's computer absent the prosecutor's statement. But the testimony of the computer forensic expert largely disproved defendant's theory. The expert testimony demonstrated that a user would have to create the folders and the folder names. He further testified that folders and images were accessed multiple times. In addition, the fact that one of the folders was labeled "tiny full naked," and Tiny was the nickname of one the victims in this case, was powerful evidence against defendant.

Even had counsel objected, the result of the trial would not have been more favorable to defendant.

### DISPOSITION

The judgment is affirmed.

23

_____
Dondero, J.

We concur:


_____P.J.
Humes, P.J.


_____
Margulies, J.